UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSE MEDRANO, | |
| Plaintiff, | |
| v. | No. 13 C 84 |
| WEXFORD HEALTH SOURCES, INC.; PARTHASARATHI GHOSH; ARTHUR FUNK; LOUIS SCHICKER; CHARLES FASANO; JACKIE MILLER; SALVADOR GODINEZ; ANDREW TILDEN; AND RANDY PFISTER, | Judge Thomas M. Durkin |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Jose Medrano, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), alleges that IDOC staff and medical service providers were deliberately indifferent to his medical needs in violation of the Eighth Amendment. *See* R. 129. He alleges this violation occurred while he was incarcerated at Stateville Correctional Center in Crest Hill, Illinois from December 30, 2009 through January 26, 2011, and at Pontiac Correctional Center in Pontiac, Illinois, since then. *See id.* Specifically, Medrano has sued IDOC Director, Salvador Godinez; IDOC Administrative Review Board Chairperson, Jackie Miller; IDOC Agency Medical Coordinator, Charles Fasano; Pontiac's Warden, Randy Pfister; the IDOC's medical services provider at both Stateville and Pontiac, Wexford Health Sources, Inc.; doctors employed by Wexford at Stateville, namely Dr. Parthasarathi Ghosh, Dr. Arthur Funk, and Dr. Louis Schicker; and a doctor employed by Wexford as

Pontiac's Medical Director, Dr. Andrew Tilden. *See id.* Wexford and its doctors have moved to transfer this case to the United States District Court for the Central District of Illinois (where Pontiac is located) pursuant to 28 U.S.C. § 1404(a). R. 159. Wexford and Dr. Tilden, and Director Godinez and Chairperson Miller, have also moved to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). R. 134; R. 141. For the following reasons, the motion to transfer is denied, Director Godinez and Chairperson Miller's motion to dismiss is granted, and Wexford and Dr. Tilden's motion to dismiss is granted in part and denied in part.

**Legal Standard**

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

**Background**

Medrano was incarcerated at Pontiac through December 29, 2009. R. 129 ¶ 15. During that time, beginning in 2003, he was given medial furloughs to visit neurosurgeons and pain specialists at the University of Illinois at Chicago ("UIC") regarding "severe pain in his back." *Id.* ¶ 17.

On December 30, 2009, Medrano was given another medical furlough to visit doctors at UIC. *Id.* ¶¶ 15, 18. As a part of this latest medical furlough, Medrano was transferred from Pontiac to Stateville (the "Stateville furlough"). *Id.* ¶ 15. He was incarcerated at Stateville until he was transferred back to Pontiac on January 26, 2011. *Id.* During the Stateville furlough, Medrano also received treatment from specialists at UIC for (1) back pain; (2) right hand and wrist pain; and (3) right shoulder pain. *See id.* ¶¶ 18, 39, 46. Medrano alleges that Defendants have been deliberately indifferent to these three medical conditions.

**I.  Back Pain**

Medrano alleges that he was initially diagnosed with "certain back-related conditions" in 2003. R. 129 ¶ 17. Dr. Bergin and Dr. Konstantin Slavin, "[b]oard certified neurosurgeons at UIC, diagnosed [Medrano] with . . . foraminal stenosis,

3

sciatic nerve involvement, and disk bulge and degenerative joint disease of his spinal column." *Id.*[1] Pain specialists at UIC, Dr. Charles Laurito and Dr. O. Fischer, prescribed naproxen, Neurontin, and hydrocodone to treat Medrano's back pain. *Id.*

During his Stateville furlough, on February 17, 2010, Medrano returned to UIC and Dr. Laurito gave Medrano a transforaminal epidural steroid injection.[2] *Id.* ¶ 18. Medrano's pain worsened after receiving the epidural steroid injection. *Id.* ¶ 19. On July 19, 2010, Dr. Slavin recommended that Medrano receive more steroid injections because oftentimes when the first steroid injection is ineffective, further injections are helpful at reducing pain. *Id.* Dr. Slavin also recommended adding oral Tramadol (a pain killer) to his prescriptions for his back pain. *Id.*

On January 5, 2011, Dr. Ghosh physically examined Medrano at Stateville. *Id.* ¶ 21. Dr. Ghosh told Medrano he would not receive any further epidural steroid injections because his back condition did not require them and they were too costly. *Id.* Medrano alleges that Dr. Ghosh told Dr. Funk, who then informed IDOC Agency Medical Coordinator, Charles Fasano, that epidural steroid injections were ineffective in alleviating Medrano's back pain. *Id.*

---

[1] Medrano's complaint does not provide Dr. Bergin's full name.

[2] An "epidural steroid injection," is a procedure in which "steroid medicine [is] injected, under x-ray guidance, into the right spot" in a patient's spine. See USC Center for Spinal Surgery, *Treatment Options*, http://www.uscspine.com/treatment/steroid-injections.cfm (last visited July 21, 2015). "A transforaminal [epidural steroid injection] means the injection is placed slightly to one side of the spine, and the medicine is injected near the ruptured disc and inflamed spinal nerve. A caudal [epidural steroid injection] is performed by placing the needle near the tailbone, and injecting the medicine into the region of the sacral nerves and lower lumbar spinal nerves. *See id.*

Upon his return to Pontiac, Medrano alleges that he was treated by "Dr. Tilden or by other back care providers," but that they failed to ensure that he "received necessary medical treatment, including the full extent of treatment recommended by Dr. Slavin." R. 129 ¶ 63. Despite this alleged deliberate indifference, Medrano did receive a caudal epidural steroid injection at Pontiac on February 25, 2011. *Id.* ¶ 23. That injection was the last Medrano received and his back pain has remained "severe and debilitating." *Id.*

## II. Right Hand and Wrist Pain

Medrano alleges that he has suffered from severe pain and numbness in his right hand and wrist leading up to his right arm and shoulder since 2003. *Id.* ¶ 34. Prior to his Stateville furlough, on May 12, 2009, Andrew Offerman, an occupational therapist at a hospital in Pontiac, Illinois, prescribed a Kevlar wrist brace to hold Medrano's wrist at a 15-20 degree angle at night. *Id.* ¶ 36.

Several months later on December 31, 2009, at the beginning of his Stateville furlough, Medrano told Dr. Ghosh that he had been prescribed a Kevlar brace. *Id.* ¶ 37. Dr. Ghosh, however, told Medrano he would not receive a Kevlar brace because it was too expensive and he would receive an elastic brace instead. *Id.* Medrano alleges that he told Dr. Ghosh that the the elastic brace was ineffective in holding his wrist at a 15-20 degree angle. *Id.* ¶ 38. Medrano never received a Kevlar brace. *Id.*

The pain in Medrano's hand and wrist worsened. *Id.* ¶ 39. On July 19, 2010, a UIC pain specialist prescribed Tramadol and physical therapy for Medrano. *Id.* In

5

late December 2010 or early January 2011, Medrano asked Dr. Ghosh, Dr. Funk, Dr. Schicker, and Fasano to give him physical therapy and a Kevlar brace, but he did not receive either. *Id.* ¶ 41. Medrano alleges that his pain grew worse because he never received a Kevlar brace or physical therapy. *Id.* ¶ 40.

### III. Right Shoulder Pain

During Medrano's Stateville furlough, on December 31, 2009, Dr. Benjamin Goldberg, an orthopedic specialist at UIC, diagnosed Medrano with a labrum tear and a cyst in his right shoulder. *Id.* ¶ 46. On October 4, 2010, Dr. Goldberg performed surgery on Medrano's right shoulder for adhesive capsulitis with bursitis. *Id.* On October 18, 2010, Medrano visited Dr. Goldberg at UIC for a follow-up visit where Dr. Goldberg recommended that he engage in physical therapy that focused on aggressive range of motion exercises. *Id.* ¶ 47.

Medrano began physical therapy at Stateville a week after his October 4, 2010 appointment with Dr. Goldberg. *Id.* ¶ 48. Two months into therapy, Medrano's shoulder pain worsened, and his physical therapist, Paul Humphries, concluded that physical therapy was ineffective for Medrano and if continued, would be harmful to his shoulder. *Id.* Humphries told Dr. Ghosh, Dr. Funk, and Fasano that he thought physical therapy was ineffective for Medrano and he should see Dr. Goldberg at UIC for follow-up care and further consultation. *Id.* Medrano alleges that Dr. Ghosh, Dr. Funk, and Fasano refused to allow him to return to UIC to meet with Dr. Goldberg. *Id.* ¶ 49.

## IV. Medrano's Grievance History

Upon his return to Pontiac, Medrano filed a grievance with the IDOC dated February 24, 2011. *See* R. 129-3. In the grievance Medrano claimed that the doctors at Stateville and IDOC officials "refused and failed to comply with the Orthopedic specialist, the Pain clinic specialist, and the neurosurgeon's prescribed treatment." *Id.* at 3. Specifically, Medrano complained that he had not received the Kevlar brace, occupational therapy, follow-up treatment for his shoulder, and steroid injections that he had been prescribed. *Id.* at 2-4.

Medrano did not receive a response to his February 24 grievance, so he wrote a letter to the IDOC Administrative Review Board ("ARB") asking for a response. R. 129 ¶ 24. Having received no response to his grievance or ARB letter, Medrano wrote letters to ARB Chairperson, Jackie Miller, dated June 2, July 16, and September 5, 2011, seeking a response. *Id.* ¶¶ 25-27. Medrano also wrote a letter to "Ms. T. Anderson" at ARB, dated October 13, 2011. *Id.* ¶ 28. Having received no response to his grievance or letters to the ARB, Medrano wrote two formal complaint letters to IDOC Director Godinez, dated November 28 and December 26, 2011, asking for a response to his grievance and ARB letters. *Id.* ¶¶ 29-30. As of September 3, 2014, when Medrano filed his Fourth Amended Complaint, he had not received a formal response to his February 24, 2011 grievance. *Id.* ¶ 33.

Medrano alleges that the pain in his right shoulder and right hand and wrist has worsened, *id.* ¶¶ 44, 52, and that his back pain has remained "severe and debilitating." *Id.* ¶ 23. Medrano has not received a steroid injection since February

7

25, 2011. *Id.* In addition to seeking damages for Defendants' alleged deliberate indifference, Medrano seeks the following injunctive relief: (1) further treatment from Dr. Slavin at UIC; (2) provision of a Kevlar brace that will hold his wrist at a 15-20 degree angle and physical therapy for his wrist; (3) further treatment from Dr. Goldberg for his right shoulder pain; and (4) an injunction preventing Defendants from impeding Medrano from receiving such medical care. *Id.* at 27-31.

## Analysis

I. **Venue**

Wexford and its doctors (Dr. Tilden, Dr. Ghosh, Dr. Funk) seek to have this case transferred to the Central District of Illinois, where Pontiac is located, pursuant to 28 U.S.C. § 1404(a). R. 159. Under 28 U.S.C. § 1404(a), "a district court may transfer any civil action to any other district or division where it might have been brought" for "the convenience of the parties and witnesses" and "in the interest of justice." The statute "is intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). "The statute permits a 'flexible and individualized analysis' and affords district courts the opportunity to look beyond a narrow or rigid set of considerations in their determinations." *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010) (quoting *Stewart*, 487 U.S. at 29).

8

"With respect to the convenience evaluation, courts generally consider the availability of and access to witnesses, and each party's access to and distance from resources in each forum." *Research Automation*, 626 F.3d at 978. "Other related factors include the location of material events and the relative ease of access to sources of proof." *Id.*

"The 'interests of justice' is a separate element of the transfer analysis that relates to the efficient administration of the court system." *Id.* "For this element, courts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy." *Id.* (internal citations omitted). "The interest of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result." *Id.*

With respect to the "location of material events," Wexford and its doctors argue that transfer is appropriate because Medrano's claims are "predicated primarily" on his stay at Pontiac, where he currently resides. R. 160 at 1. The Court disagrees with this contention. Medrano's complaints stem from treatment he received at UIC during his Stateville furlough, and the alleged decision by the Stateville doctors not to comply with the prescriptions and other directions of the UIC doctors. Of course, Medrano alleges that he continues to suffer from this lack of

9

treatment at Pontiac. But this is not a basis to conclude that Pontiac is any more the "location of material events" than Stateville.

Moreover, with respect to the location of the parties, Medrano has sued three doctors who treated him at Stateville compared to only Dr. Tilden from Pontiac. Wexford itself provides medical services at both Pontiac and Stateville. Warden Pfister is located in Pontiac, but Medrano has only sued him in order to obtain injunctive relief, and he will not be deposed. Medrano's counsel has represented that they will depose Dr. Tilden in Pontiac. *See* R. 170 at 5. The other defendants who have not moved for transfer are all IDOC officials who are frequently defendants in this District. Thus, the location of the parties does not counsel in favor of transfer.

Access to "sources of proof" also does not counsel in favor of transfer. Wexford and its doctors argue that "the non-party witnesses that possess the majority of relevant information as it pertains to liability work and reside in the Central District," R. 160 at 8, and "[r]ecords regarding [Medrano's] incarceration at Pontiac . . . are kept at Pontiac." *Id.* at 10. There is no indication in Medrano's complaint, or in Wexford and its doctors' motion, as to who these non-party witnesses might be, and it is not certain that any such witnesses will be relevant to this case. In any event, to the extent non-party witnesses from Pontiac are relevant, Medrano's counsel has represented that "they will likely be deposed in Pontiac and their depositions will be used at trial." R. 170 at 4. Moreover, the other non-party witnesses—i.e., the UIC doctors who provided the treatment that is at the heart of

Medrano's claims—are located in this District. Additionally, the parties are already in possession of all the relevant documentary evidence in the record. The Central District is no more convenient than this District with respect to access to sources of proof.

The movants also argue that the "interests of justice" counsel in favor of transfer to Pontiac because there "is an inherent unfairness of burdening citizens in the Northern District with jury duty for a case where the majority of relief requested (especially the requested injunctive relief) arises out of occurrences primarily in an unrelated forum." R. 160 at 12. But as noted above, a significant portion of the material events occurred in this District, negating any potential unfairness. Furthermore, other factors relevant to the "interests of justice," such as docket congestion, speed to trial, and the courts' familiarity with the relevant law, are neutral in this instance.

Therefore, the motion by Wexford and its doctors to transfer the case to the Central District of Illinois is denied.

## II. Motions to Dismiss

In Counts I, II, and III, Medrano alleges that Defendants violated his civil rights because they knew of his serious medical conditions, "and took no steps to enable [Medrano] to receive [the] treatment [he required]." *See* R. 129 ¶¶ 53-95. "Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). To establish

a deliberate indifference claim under this standard premised upon inadequate medical treatment, a plaintiff must show (1) that the plaintiff suffered an objectively serious risk of harm, and (2) that the defendant acted with a subjectively culpable state of mind in acting or failing to act in disregard of that risk. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

### A. Personal Involvement and Supervisory Liability

The subjective element of a deliberate indifference claim cannot be premised upon a theory of respondeat superior. *See Arnett v. Webster*, 658 F.3d 742, 757 (7th Cir. 2011). Instead, a plaintiff's allegations against a prison official can only satisfy "the personal responsibility requirement of section 1983 if the conduct causing the constitutional deprivation occurs at [the official's] direction or with his knowledge and consent." *Id.* "That is, [the official] must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* "In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery." *Id.* Thus, although a prison official "is entitled to relegate to the prison's medical staff the provision of good medical care," *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009), "nonmedical officials can be chargeable with . . . deliberate indifference where they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Arnett*, 658 F.3d at 755.

#### 1. Director Godinez and Chairperson Miller

Medrano only alleges that Director Godinez and Chairperson Miller had

notice of his medical conditions and treatment from the grievances he filed and letters he sent. He does not allege that Director Godinez or Chairperson Miller took any action that prevented Medrano from receiving adequate medical care. Absent allegations of such causal conduct, Medrano's allegations are insufficient to state a claim. *See Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) ("[T]he alleged mishandling of Owens's grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim."); *see also George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation."); *Neely v. Randle*, 2013 WL 3321451, at *3 (N.D. Ill. June 29, 2013) ("If there is 'no personal involvement by the warden [in an inmate's medical care] outside the grievance process,' that is insufficient to state a claim against the warden." (quoting *Gevas v. Mitchell*, 492 Fed. App'x 654, 660 (7th Cir. 2012))).

For written notice to prison administrators to form the basis of a deliberate indifference claim, the plaintiff "must demonstrate that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Arnett*, 658 F.3d at 755. Medrano cannot make such an allegation here. Rather, Medrano alleges he received regular appointments with doctors, a number of medical tests, and medication prescriptions in an attempt to address his medical conditions. It may be that Medrano has sufficiently alleged that some of this treatment fell below a constitutionally adequate level. That question is not at issue on this motion. But in

13

the absence of allegations that Medrano was "completely ignored by medical staff," *Arnett*, 658 F.3d at 756, Director Godinez and Chairperson Miller were entitled to rely on the medical judgments supporting the treatments Medrano alleges he received. *See id.* ("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."). The Seventh Circuit has affirmed district court dismissals of similar allegations. *See Adams v. Durai*, 153 Fed. App'x 972, 975 (7th Cir. 2005) ("An administrator does not become responsible for a doctor's exercise of medical judgment simply by virtue of reviewing an inmate grievance, and that is all [the plaintiff] alleges here."); *Greeno v. Daley*, 414 F.3d 645, 655-56 (7th Cir. 2005) ("We do not think [the prison official's] failure to take further action once he had referred the matter to the medical providers can be viewed as deliberate indifference.").[3] Accordingly, Medrano's claims against Director Godinez and Chairperson Miller are dismissed.

---

[3] *See also Brown v. Wexford Health Sources.*, 2014 WL 257552, at *3 (N.D. Ill. Jan. 23, 2014) ("[The Warden's] refusal to consider two emergency grievances as emergencies, which is all Plaintiff's complaint alleges even under a liberal construction, by itself, does not indicate that [the Warden] caused or participated in Plaintiff's alleged inadequate medical care and does not state a claim."); *Foster v. Ghosh*, 2013 WL 3790905, at *4 (N.D. Ill. July 19, 2013) ("[The Warden] is not liable under the doctrine of deliberate indifference for simply serving in his administrative role at the Stateville Correctional Center."); *cf. Jones v. Drew*, 221 Fed. App'x 450, 454 (7th Cir. 2007) (affirming a grant of summary judgment because "[a]lthough [the plaintiff] mailed a complaint to [the Warden] and filed a grievance at [the prison] describing his frustration with his treatment, there is no evidence that [the Warden] personally received or read these communications since he delegated the review of prisoner complaints to others within his office."); *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006) (affirming a grant of summary judgment because "[t]he fact that [the plaintiff] sent a letter or letters to [the IDOC Director] is insufficient to create a genuine issue of material fact regarding defendant Snyder.").

### 2. Dr. Tilden

Medrano alleges that Dr. Tilden was Pontiac's Medical Director, and in that role "had primary care, management and administrative responsibilities at Pontiac, including [Medrano's] treatment and care." R. 129 ¶ 10. Medrano alleges further that after he "returned to Pontiac, [he] was seen by . . . Dr. Tilden or by other back care providers whose recommendations and treatment were approved and supervised by [Dr.] Tilden." *Id.* ¶ 63. Medrano claims that his "medical records indicated the deliberate indifference to [his] serious medical need, specifically, his 'back condition' . . . . [but] Dr. Tilden failed to act on that information by ensuring [Medrano] received necessary medical treatment, including the full extent of treatment recommended by Dr. Slavin." *Id.*

Dr. Tilden argues that "[h]aving access to [a patient's] medical chart by virtue of one's position as a prison doctor does not impute deliberate indifference on the part of physicians not involved in a patient's treatment decisions." R. 135 at 5. It is true that *respondeat superior* liability is not available for a claim under § 1983. Medrano, however, does not use the mere fact of Dr. Tilden's title to establish his liability. Rather, Medrano alleges that he received inadequate care at Pontiac when he failed to receive the treatment prescribed by the UIC doctors. Medrano argues that Dr. Tilden had knowledge of this inadequate treatment due to his supervisory positions as Medical Director. In this way, Medrano's allegation is quite different from the allegations against Director Godinez and Chairperson Miller, which the Court has already dismissed. Dr. Tilden is not merely responsible for prison

15

administration generally, but is responsible for medical care in particular. This allegation is enough for the Court to infer that Dr. Tilden knew about any inadequate care Medrano received and did nothing to remedy the situation. This is sufficient to state a claim against him based on Medrano's accompanying allegation that he has not received the treatment prescribed by the UIC doctors.

### B. *Respondeat Superior* Liability for Wexford

Medrano alleges that Wexford is liable for his injuries both directly through its policies and practices, R. 129 ¶ 66, and on the basis of *respondeat superior*. *Id.* ¶¶ 65, 79, 93. Wexford has moved to dismiss the claims against it to the extent they are based on a *respondeat superior* theory. Medrano, of course, concedes that "under the current state of the law, a cause of action against Wexford based solely on *respondeat superior* cannot be maintained." R. 156 at 9; *see also Shields v. Ill. Dep't of Corrections*, 746 F.3d 782, 796 (7th Cir. 2014). Medrano, however, urges the Court to deny Wexford's motion to dismiss the *respondeat superior* claim on the basis of the reasoning expressed in *Shields v. Illinois Department of Corrections*, in which the Seventh Circuit questioned the rationale expressed in precedential case law for prohibiting *respondeat superior* liability for corporations under § 1983. R. 156 at 9-10 (citing 746 F.3d at 789-97).

Despite the *Shields* panel's reasoning, this Court is bound to follow existing precedent. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) ("[D]ecisions of a superior court are authoritative on inferior courts. Just as the court of appeals must follow decisions of the Supreme Court whether or not we

16

agree with them, so district judges must follow the decisions of this court whether or not they agree."). The Seventh Circuit was clear that the law of this Circuit "still extends *Monell* [and its prohibition on *respondeat superior* liability] from municipalities to private corporations." *Shields*, 746 F.3d at 796. And shortly after its decision in *Shields*, the Seventh Circuit indicated it would not apply *respondeat superior* liability under § 1983 to corporations until an "intervening on-point Supreme Court decision" requires it. *Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014), *reh'g and suggestion for reh'g en banc denied* (Sept. 9, 2014). Thus, Medrano's claim against Wexford based on *respondeat superior* must be dismissed.

**Conclusion**

For the foregoing reasons, the Court denies the motion to transfer venue, R. 159. The Court grants Director Godinez and Chairperson Miller's motion to dismiss, R. 141. The Court denies Wexford and Dr. Tilden's motion to dismiss, R, 134, with respect to Dr. Tilden, but grants that motion with respect to the *respondeat superior* claim against Wexford.

A status hearing is scheduled for Tuesday, August 18, 2015. At that hearing, the parties should propose a discovery schedule. The proposed schedule should provide for expedited completion of discovery as this case is more than is two-and-a-half years old. The parties should also be prepared to discuss whether they want the case referred to Magistrate Judge Finnegan for a settlement conference.

17

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: July 21, 2015